[Civ. No. 24238.   First Dist., Div. Four.   Aug. 2, 1968.]

BEVERLY HILLS OIL COMPANY, Plaintiff and Appellant, v. BEVERLY HILLS UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

Clifford E. Enger for Plaintiff and Appellant.

John O. Maharg, County Counsel, and James W. Briggs, Deputy County Counsel, for Defendant and Respondent.

DEVINE, P. J.—The question in this case is whether the trial court's interpretation of an oil and gas lease, whereby the judge decided, after admitting extrinsic evidence, that the

word "rentals" does not mean "royalties" but refers to "delayed rentals" or payments for deferring of drilling, may be sustained.

### General Facts

On June 2, 1959, the Beverly Hills Unified School District leased to Allen Guiberson about 22 acres of land which were largely occupied on the surface by facilities of a high school. The lease was for the exploitation of oil and gas. The allowable drillsite was but 0.459 acres. Operations beyond the drillsite were to be carried on at least 500 feet below the surface. The lease had been obtained by competitive bidding, as required by the Public Resources Code (div. 6, pt. 2, ch. 5). The notice inviting bids required that the royalty be at least 20 percent of all oil and gas produced. Guiberson's bid included a royalty of 50 percent. There was provision for a bonus of $50,000 to be paid to the lessor as a consideration for the making of the lease.

At this point it is necessary for an understanding of a recital of the facts to give the critical part of paragraph 15 of the lease, which reads as follows: "It is agreed that Lessee may at any time, or from time to time, when Lessee is not in default, either before or after discovery of oil in the leased land, surrender and quitclaim this lease, either in its entirety or in part, and thereupon Lessee shall be released from all further obligations as to the part or parts so quitclaimed, and all rentals (not including the payments provided for in Paragraph 6 above) and drilling obligations as set forth in this lease shall be reduced pro rata according to the amount of acreage so quitclaimed by Lessee, it being particularly understood, however, that all lands so quitclaimed shall remain subject to, and Lessee shall have the right to use and enjoy, such rights-of-way and easements in, under and through the quitclaimed portion of the leased land as may be necessary or convenient, in whole or in part, for Lessee's operations on the land retained under this lease; provided, however, that any well drilled through any such quitclaimed portion of the leased land shall have no part of its producing interval in such quitclaimed portion; and further provided that Lessor may not discharge or terminate any of its accrued obligations by such surrender or quitclaim."

Guiberson ran into difficulties and was besieged by creditors. Production of the wells was disappointingly low. Follow-

ing protracted negotiations, an assignment of the lease as of April 4, 1961, was made to Beverly Hills Oil Company and consented to by the school district. The company attempted by negotiation with the school district to effect a reduction of the 50 percent royalty. The company's proposals were not accepted. On July 31, 1962, the oil company tendered a quitclaim deed to the school district, purporting to release the northerly three fifths of the leasehold property. The deed contained the following language:

"This conveyance is made on the condition that the royalty obligations on the remaining portion of the leasehold is reduced to 20% pursuant to the provisions of the lease.

"This conveyance is not intended to convey grantors rights and interest in the drillsite, nor the oil and gas wells now being produced thereon."

A second quitclaim deed was tendered, in which the condition was not expressly stated, but it was and is the position of the oil company that the effect of the deeds is to reduce the royalty to 20 percent.

### The Trial and the Issues

The oil company brought this action in declaratory relief seeking to have it established that by the provisions of paragraph 15 of the lease, the lessee has reduced its royalty obligation on the subsurface oil and gas lease to the rate of 20 percent. The school district sought a determination that the quitclaims did not have the effect of reducing the royalty share. (Other issues were presented by the pleadings, but upon stipulation that the issue of the effect of paragraph 15 should be decided first, and upon the court's decision in favor of respondent school district, the other issues became irrelevant for all present purposes.) The trial judge decided that the word "rentals" as contained in paragraph 15 of the lease does not refer to royalties, and that "in fact there is no referent with respect to said term 'and all rentals' as used in said Paragraph 15 of said lease, said term having been used inadvertently."

Plaintiff, in its case in chief, offered nothing but the lease and two depositions which are referred to below. Defendant produced an expert witness, Earl Hightower, who gave his opinion, described later, as to the meaning of the word "rentals," and an officer of the school district, who identified certain correspondence. Plaintiff produced Mr. Enger as an expert witness to give his interpretation of the word "rentals."

## Admissibility of Parol Evidence

Appellant oil company contends that the lease is unambiguous in that the word "rentals" clearly is the equivalent of the word "royalties" and that it was error therefore for the court to admit extrinsic evidence. We do not agree. In the first place, it may well be that, as respondent contends, appellant waived objection to extrinsic evidence by offering the two depositions. This is not clear, however, because it is possible to read the record as showing that counsel for appellant offered the depositions contingently; that is, that the depositions were submitted only if the court should rule, contrary to appellant's contention, that extrinsic evidence was necessary for interpretation of the lease. But, independently of the subject of waiver, the case is one in which the admission of extrinsic evidence was thoroughly justified. The word "rentals" is a different word from the word "royalties" in its etymology. There are rentals in myriads of cases outside the extractive industries where there are no royalties; and there may be royalties which have no reference to leaseholds within those industries. (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal.2d 637, 654 [52 P.2d 237].) In respect of oil and gas leases, the question whether the two words mean the same thing, and if so, whether they always do or only under certain circumstances, can be answered only by knowledge of technical terms because these leases are of a highly specialized character. "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." (Civ. Code, § 1645.) In order to inform himself upon the understanding of persons in the oil industry, the judge had to consult the opinions of experts, as contained in the testimony of the two who appeared as witnesses and as found in treatises. Besides the technicality of the subject, there is present ambiguity which makes way for parol evidence. (*Nofziger* v. *Holman,* 61 Cal.2d 526 [39 Cal.Rptr. 384, 393 P.2d 696].) The ambiguity arises not only from the use of two different words, "rentals" and "royalty," but also from the extrinsic evidence once it was admitted. Unlike a search under criminal law, which is not justified by what it turns up, an exploration in civil cases into the domain of extrinsic evidence may, by what it produces, confirm the rightness of the quest itself. (See *Pacific Gas & Elec. Co.* v. *G.*

■■■■■■■

*W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 40, fn. 8 [69 Cal.Rptr. 561, 442 P.2d 641].)

### *Meaning of "Rentals" in Surrender Clause*

■■■■■ That paragraph of the lease which is the subject of the dispute is a typical surrender clause. In fact, it is identical almost word for word* with a California lease form of surrender clause given in the monumental work, Williams and Meyers, Oil and Gas Law, by professors of law at Stanford University (Vol. 4, § 680, p. 280). The nature of a surrender clause is described as follows: "The usual surrender clause permits the lessee to extinguish a lease in whole or in part by surrender. By virtue of such a clause the lessee may be able to retain that portion of leased acreage which appears most promising while relieving himself of obligations as concerns payment of rentals, protection, exploration or development of that portion of the leased premises which appears to him to be least promising." (*Id.*, p. 278.)

Now as to the distinction of "rental" or "rentals," Professor Hightower of U.C.L.A., an expert in oil and gas leases, testified that in California the word "rental" is synonymous with the term "delayed rental" which is a payment for deferment of drilling obligations by the lessee. Hightower had earlier distinguished "delay rental" (the words "delay" and "delayed" seem to be used without distinction everywhere), as an obligation under the "drill or pay" lease, from "royalty," which is a share of the production which the landowner reserves to himself; and he had written that the surrender clause is a protection to the lessee against rental arising from failure to develop land which is found not to warrant exploitation. (Hightower, *The Oil and Gas Lease in California* (1956) 3 U.C.L.A. L.Rev. 424, 441.)

To the same effect is the passage in Thornton on Oil and Gas (Kuntz, 1960 Cum.Supp.) § 364, p. 45: "In oil and gas leases 'bonus' means cash consideration or down payment for execution of lease; 'rental' is the consideration for the privilege of delaying drilling; 'royalty' is a share of the product or proceeds reserved to the owner for permitting another to use the property." In Williams and Meyers, Manual of Oil and Gas Terms, pp. 92-93, we find delay rental defined as: "A sum of money payable to the lessor by the lessee for the privilege of deferring the commencement of drilling operations or

---

*Nonrefundability of the bonus excepted.

the commencement of production during the primary term of the lease.'' Under the heading ''Rental'' in the same work, there is the reference, ''See Delay Rental.''

Opposed to the testimony of Professor Hightower is that of Clifford E. Enger, an attorney experienced in oil leases, who is counsel for appellant on this appeal and who had a substantial interest in appellant corporation. It was his testimony that a rental would encompass all kinds of payment, including royalties, delayed rentals or other kinds of compensation. The word ''rental,'' he said, is used interchangeably with the word ''royalty,'' and the words ''delayed rental'' would not be used interchangeably with the word ''royalty.''

Since there were conflicts in the testimony, no doubt the court's decision, had it been based on no more than what has been described up to this point, would have been sustained whether it favored one party or the other.

But the court had other resources upon which to draw. A contract must receive such interpretation as will make it reasonable. (Civ. Code, § 1643.)   The judge concluded, and we agree, that to interpret paragraph 15 of the lease as enabling the lessee to effect a percentage reduction of the royalty would be unreasonable. There is not sufficient, if any, connection between the amount of acreage surrendered and the percentage of reduction of royalty asserted by appellant. By quitclaiming the less favorable portions of the area, appellant would, it is true, surrender its right to bottom its wells beneath, or to whipstock wells into, the quitclaimed subjacent area. But this should not have the effect of reducing the percentage of royalty on the oil and gas actually being captured. By reason of the fugacious nature of these hydrocarbons the possessor of the drillsite will recover products from surrounding subsurface areas. The trial judge observed, in this connection, that the whole leasehold contained only a little over 22 acres. Thus, to couple the quitclaiming of acreage with diminution of royalty percentage is unreasonable.

Moreover, if appellant could reduce the royalties by three-fifths, why could it not reduce them still lower by quitclaiming a larger acreage if appellant found it profitable to do so? Appellant replies that the percentage could not in any event be reduced below the 20 percent called for in the invitation for bids. This no doubt is why the three-fifths figure was selected, because under appellant's theory this would reduce the 50 percent royalty to 20 percent. But if paragraph 15 of

the lease really were to refer to reduction of royalty proportionate to surrender of acreage, it would, since there is no limit to the reduction expressed in paragraph 15, conflict with the notice for bids and bring about a violation of the requirements for bidding as contained in Public Resources Code, sections 7051-7056. To interpret the paragraph as containing a limitation on the reduction of royalties to 20 percent, as appellant proposes, would be to go outside the lease (a procedure which, incidentally, is not in accord with appellant's protest against accepting extrinsic evidence) and to, rewrite paragraph 15.

Although the lease imposes certain drilling obligations on the lessee (to drill offset wells, to drill five successive wells on the drillsite, and to drill against waste and drainage), there is no specification anywhere in the lease of an obligation to pay delay rentals. The ''drill or pay'' clause against which a surrender clause is commonly set off, ordinarily is expressed as an agreement to drill according to a certain plan or to pay the lessor an agreed amount per acre per year. (3 Williams and Meyers, Oil and Gas Law, § 605, pp. 88-89, § 605.3, p. 108; and see *Walston* v. *Flintridge Oil Co.*, 133 Cal.App.2d 660 [284 P.2d 895].) The drill or pay clause logically is related to acreage and not to royalties because the failure to drill causes an absence of royalties. Thus, where there is a drill or pay clause with its reference to acreage, there is a logical counterpart in reducing the rentals, the ''pay,'' upon quitclaiming of acreage. Without the drill or pay clause, the surrender clause has, to use the words of the trial judge, ''no referent.'' ■ In giving effect to the general meaning of an instrument, words are sometimes wholly disregarded, transposed or supplied. (3 Williston, Contracts, p. 1781; *Heidlebaugh* v. *Miller*, 126 Cal.App.2d 35, 38 [271.P.2d 557].)

■ Appellant calls attention to the rule of interpretation that effect should be given to every part of a contract and says this ought to be done by construing the word ''rentals'' to mean royalties, rather than by declaring the word to be useless in the lease. But section 1641 of the Civil Code declares that the rule of giving effect to every part of a contract should be applied only if it is ''reasonably practicable.'' To give the effect desired by appellant to the word ''rentals'' would lead to the unreasonable conclusion stated above.

■ The word ''rentals'' appears but once in the lease, in paragraph 15, and it is closely coupled therein with the

words "drilling obligations." On the other hand, the word "royalty" (or its synonym, "royalty share") is used twenty times in the lease, always with reference to the lessor's share of the production. As we have said above, paragraph 15 was taken almost bodily from a standard form. These facts support respondent's assertion that the "rentals" provision in the lease was the result of inadvertence.

■ Appellant points out that uncertainties are to be interpreted against the party who caused them to exist. (*Knox* v. *Wolfe*, 73 Cal.App.2d 494, 500 [167 P.2d 3].) Respondent replies that by the terms of section 1654 of the Civil Code it is presumed, in the case of a contract between a public body and a private party, that all uncertainty was caused by the private party. This presumption, however, does not apply because it was admitted candidly by respondent's counsel at the trial that the mistake was brought about by the school district. But the rule that uncertain provisions are to be interpreted against the party who caused them is but one of the standards for decision, and it must be balanced against others such as those described above. If the word "rentals" got into the lease because of carelessness on the part of its draftsmen (and even of the same expert, Professor Hightower, who had been retained by the school district as a consultant), the defect was not protested by anyone advising the lessee.

■ The court was entitled to take into account the conduct of the parties in interpreting the terms of the lease. (*Crestview Cemetery Assn.* v. *Dieden*, 54 Cal.2d 744, 753-754 [8 Cal.Rptr. 427, 356 P.2d 171].) When Guiberson ran into difficulties and proposed to the school district that the percentage of royalty be reduced, he did not do so by tendering a quitclaim deed, nor did he assert his right to do so. His assignee, appellant corporation, sought renegotiation of the royalty originally. It was not until many months had gone by since the first attempt of appellant to renegotiate that appellant asserted its claim to effect reduction of the royalty by diminution of the acreage.

### Exclusion of Unsigned Deposition

■ Appellant offered in evidence the deposition of Guiberson. Guiberson had refused to sign the deposition. He had given no reason for his refusal to sign. The court caused the deposition to be marked for identification, but refused to admit it in evidence because of the failure to explain the

refusal to sign. Appellant contends that the deposition should have been admitted in evidence.

Section 2019, subdivision (e) of the Code of Civil Procedure, reads in part as follows: "If the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be used as fully as though signed, unless on a motion to suppress under subdivision (d) of Section 2021 of this code the court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part." It seems likely from this sentence that even if no reason be given by the deponent for his refusal to sign, the deposition may be used, in the absence of a motion to suppress. No such motion was made in this case. No case, however, is cited in which the section has been interpreted. There is some doubt about the matter because section 2021, subdivision (d) provides as follows: "Errors and irregularities in the manner in which the testimony is transcribed or the deposition is prepared, signed, certified, sealed, indorsed, transmitted, filed, or otherwise dealt with by the officer under Sections 2019 and 2020 of this code are waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained." It is not clear that the refusal to sign a deposition constitutes an error or irregularity "in the manner in which the testimony is . . . signed," for it has not been signed at all, and there has been no stipulation waiving signature. Whether a motion to suppress would lie is not certain. But we think that in any event there was no reversible error, for two reasons: one related to procedure, the other to substance.

As to procedure, we find that the trial judge ruled upon the admissibility of the deposition in the same way that a judge would have done had a formal motion to suppress been made. He decided that where no reason at all was given for refusal to sign, the deposition should be rejected, which is tantamount to saying it should be suppressed. We do not say that this ought to be accepted procedure but that no reversible error has been shown.

In considering the matter of substance, we give a brief summary of the main part of Guiberson's deposition. Guiberson testified that when he was considering making his bid, he was

troubled about the use of the word "rentals" in paragraph 15 of the lease. He was, however, assured by the chairman of the oil committee of the school board, Champ Reese, that an adjustment of royalties was contained in paragraph 15 and that royalties could be reduced by quitclaiming the property. (There is a lack of clarity as to whether the conversations with Reese took place before or after the lease was made, but because the deposition was not admitted in evidence, we state the matter most favorably to appellant.) But there is no showing that Reese was authorized to speak for the whole board. In fact, Guiberson said in the deposition that he assumed that Reese was speaking for the board, but Reese did not tell him this and Reese did not tell him that his interpretation had been gained from the school board's lawyer. Reese was in the meat business and this was known to Guiberson. Guiberson did not know whether Reese had personal experience in the oil industry.

Reese's deposition was admitted in evidence. It had been his opinion that quitclaiming of acreage would reduce the royalties. He said he thought "that the income should be cut in direct proportion to the production of the oil wells." This, it will be observed, does not relate reduction of royalties to reduction of acreage, but to reduction of income. The court, after considering the Reese deposition, concluded properly that his opinion as but one member of the board was ineffective to show the meaning of the lease. If, therefore, the judge had admitted Guiberson's deposition with its statements that Reese had conveyed his opinion to Guiberson, no doubt the judge would have come to the same conclusion anyway. Whether the rejection of Guiberson's deposition was formally correct or not, under all of the circumstances no reversible error is present.

## Conclusion

In the vast literature relating to oil and gas leases, and in some cases cited by appellant, royalties sometimes have been described as rents or akin to rents. (*Callahan* v. *Martin*, 3 Cal.2d 110 [43 P.2d 788, 101 A.L.R. 871] ; *Dabney-Johnston Oil Corp.* v. *Walden*, 4 Cal.2d 637 [52 P.2d 237] ; *La Laguna Ranch Co.* v. *Dodge*, 18 Cal.2d 132, 139 [114 P.2d 351, 135 A.L.R. 546] ; *Tanner* v. *Title Ins. & Trust Co.*, 20 Cal.2d 814, 820 [129 P.2d 383].) But these cases have to do chiefly with the principle that oil leases generally create an interest in real property a *profit à prendre,* a principle most recently recog-

nized in *Gerhard* v. *Stephens*, 68 Cal.2d 864, 881 [69 Cal. Rptr. 612, 442 P.2d 692].

Appellant cites *Elsinore Oil Co.* v. *Signal Oil & Gas Co.*, 3 Cal.App.2d 570. This case contains language (at p. 573 [40 P.2d 523]) which refers to the words "rent" and "royalty" as interchangeable, but the reference is dictum and, besides, it is based on citations from mining leases, which are essentially different from those involving oil and gas. The *Elsinore* case indeed in its major holding is somewhat favorable to respondent. The holding is that where there was a surrender clause and a quitclaim deed was executed, the word "rental" did not include "bonus."

The interpretation placed upon the lease by the trial judge is a reasonable one. The tendered quitclaim deed was of no effect and the court properly declared it to be void.

The judgment is affirmed.

Rattigan, J., and Christian, J., concurred.