Filed 6/27/13  Corona Summit v. SPUS05 Corona Summit CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| CORONA SUMMIT, LLC,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SPUSO5 CORONA SUMMIT, L.P., et al.,<br><br>    Defendants and Appellants;<br><br>U.S. BANK NATIONAL ASSOCIATION,<br><br>    Intervener and Respondent. | B226933<br><br>(Los Angeles County<br>Super. Ct. No. BC410168) |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge.  Affirmed in part; reversed in part.

Greenberg Traurig, Eric V. Rowen, Scott D. Bertzyk, Karin L. Bohmholdt, and Thomas H. Godwin for Defendant and Appellant SPUSO5 Corona Summit, L.P.

Greenberg Traurig, Eric V. Rowen, Scott D. Bertzyk, Karin L. Bohmholdt; Greines, Martin, Stein & Richland, Kent L. Richland, Edward L. Xanders, and Gary D.

Rowe for Defendant and Appellant CB Richard Ellis Strategic Partners U.S. Opportunity 5, LP.

Grant, Genovese & Baratta, David C. Grant, Marcus G. Larson, Cindy M. Chon, and Katherine M. Erickson for Plaintiff and Respondent.

Rutan & Tucker, Ira G. Rivin, Heather N. Herd, Gerard M. Mooney, and Kathryn D. Domin for Intervener and Respondent.

_____

In this case, Buyer terminated a $68 million commercial real estate purchase and sale agreement while Seller was constructing office buildings on the property to Buyer's specifications. Buyer no longer wished to purchase the property because real estate values had plummeted during the recent financial crisis that had occurred while the buildings were under construction. Buyer sued Seller for the return of its $13 million deposit, and Seller and its construction lender sued Buyer for specific performance or damages. Following a bench trial of the consolidated actions, the superior court entered a $79 million judgment and order of specific performance that required Buyer either to (1) purchase the property for the full $68 million purchase price and pay an additional $11 million in incidental compensation, or (2) pay $79 million in damages minus the proceeds from a referee's sale of the property. After Buyer did not purchase the property within the allotted 20-day period, the property was sold by a referee for $24 million. Construction lender received $21 million in net sale proceeds plus Buyer's $13 million deposit. In light of the unpaid $45 million balance plus prejudgment interest, costs, and attorney fees, the trial court granted a postjudgment motion to add Buyer's affiliate as a judgment debtor based on an alter ego theory of liability.

On appeal, Buyer, SPUS05 Corona Summit, L.P., seeks reversal of the judgment or, alternatively, reversal of the awards of specific performance, incidental compensation, and damages in excess of the $13 million deposit. Buyer contends section 11(g) of the

2

purchase and sale agreement allowed it to terminate the agreement and recover its deposit if the property declined in value. Alternatively, Buyer contends section 10(a) of the purchase and sale agreement limited its liability for a terminating breach to the payment of liquidated damages in the amount of the deposit. We agree with the latter contention only. We therefore affirm the finding of Buyer's liability for breach of contract, but reverse the awards of specific performance and damages in excess of the deposit. The attorney fee award and alter ego order, which were based on the $79 million judgment, are also reversed.

## FACTS AND PROCEDURAL BACKGROUND

### I.    The Parties

Seller, Corona Summit, LLC (Seller), is a single purpose limited liability entity created by Armstrong-Butcher Properties, LLC, which is wholly owned by developers William Blair Armstrong and Greg Butcher.

Construction lender, California National Bank (Bank), issued Seller a construction loan that was guaranteed by Seller's principals and secured by a deed of trust to the property. The deed of trust gave Bank a security interest in the purchase and sale agreement between Buyer and Seller. After Bank filed its complaint in intervention in this litigation, Bank became insolvent and a receiver was appointed. Respondent U.S. Bank National Association (also referred to as Bank) is the receiver's successor-in-interest.

Buyer, SPUS05 Corona Summit, L.P. (Buyer), is a single purpose limited liability entity created by CB Richard Ellis Strategic Partners U.S. Opportunity 5, LP (Fund V). Buyer was created for the sole purpose of taking title to the property. Because the sale was not completed, Buyer was never funded and, therefore, has no assets with which to pay the judgment.

In a postjudgment proceeding, Buyer's affiliate, Fund V, which provided Buyer's $13 million deposit, was held liable as Buyer's alter ego for the balance due on the

3

judgment. Fund V is a real estate investment fund created by CB Richard Ellis Investors, LLC (CBREI), a wholly-owned subsidiary of CB Richard Ellis, Inc. (CBRE), an international real estate investment firm.[1]

## II.     The Contracts

The two contracts at issue in this litigation are (1) the December 2007 purchase and sale agreement (PSA) between Buyer and Seller, and (2) the December 2007 tri-party agreement (TPA) among Buyer, Seller, and Bank.

In the December 2007 PSA, Buyer made a "forward commitment" to pay Seller $68 million for the subject property and three shell office buildings that Seller would construct on the property to Buyer's specifications. Seller agreed to construct the three buildings within two years and transfer the property and completed improvements to Buyer by the closing date.

In the December 2007 TPA, which Bank required as a condition of making the construction loan, Buyer and Seller agreed to perform their respective obligations under the PSA, which was attached and made part of the TPA. Section 2 of the TPA stated in relevant part, "Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and pay the purchase price set forth in the Purchase Agreement (the 'Purchase Price') for the Property, subject to and in accordance with the terms, provisions and conditions contained in the Purchase Agreement, as the same may be modified hereby."

Each party's performance was linked to the performance by another party: Bank's reconveyance of the deed of trust was linked to Seller's repayment of the loan; Seller's repayment of the loan was linked to Buyer's payment of the purchase price; and Buyer's payment of the purchase price was linked to Bank's reconveyance of the deed of trust. Accordingly, the parties agreed in section 2 of the TPA to perform their respective

---

[1]     There are several consolidated appeals. In the main appeal (No. B226933), Buyer challenges the judgment. In the consolidated appeals (Nos. B231109, B232645, B234103, B235534), Buyer challenges Seller's attorney fee award and Fund V challenges the alter ego order and judgment in excess of the deposit.

4

obligations at closing in the following manner: Buyer would pay directly to Bank the portion of the purchase price necessary to pay off Seller's construction loan, subject to Bank's reconveyance of the deed of trust and Seller's satisfaction of all conditions to Buyer's purchase obligation under the PSA. If, however, the purchase price was insufficient to pay off Seller's loan, Seller would pay Bank the remaining balance due at closing, and Bank would reconvey the deed of trust after the following conditions were met: (1) Seller must pay Bank the agreed "release price," (2) Seller must provide Bank with a "111 endorsement," (3) the buildings must meet certain specifications, and (4) Seller must not be in default under any of the loan documents.

Because escrow would not close until Seller had completed construction of the three office buildings to Buyer's specifications, the parties discussed the possibility of Seller's default prior to closing. They agreed in section 19 of the TPA, for example, that Bank must provide Buyer with written notice of Seller's default and an opportunity to cure or purchase the loan. They agreed in section 15 of the TPA that if Seller defaulted, Bank could enforce the PSA with the same force and effect as Seller. They agreed in section 5 of the TPA that if Bank acquired title to the property as a result of Seller's default, Bank could either hire a construction manager acceptable to Buyer and finish the project, or terminate the PSA and return Buyer's deposit. They agreed in section 11 of the TPA that if Bank acquired title as a result of Seller's bankruptcy, Bank could enter into a new PSA with Buyer on the same terms as the existing PSA as modified by the TPA.

Although Seller was aware that Buyer was a single purpose limited liability entity that was formed solely to take title to the property and, therefore, had no assets, Seller did not require Buyer's parents or affiliates to sign the PSA or the TPA. Not only was Buyer, which had no assets of its own, to be the sole purchaser, but the parties agreed in section 9 of the TPA that if the net worth of Buyer's parents and affiliates fell below the purchase price, Seller would be in default under the construction loan, but Buyer would have no liability, and Bank and Seller would have no rights against Buyer, for Seller's default. Even though section 9 of the TPA required Buyer to provide Bank with the consolidated

5

financial statements of its parents and affiliates, the TPA did not require Buyer or its parents or affiliates to guaranty the construction loan or maintain adequate reserves to purchase the property at the agreed price.

The parties agreed in section 22 of the TPA that in the event of a breach of the TPA, the parties would have the following remedies: "Remedies. Each of the parties hereto recognizes and agrees that remedies at law for breach of this Agreement by Seller, Purchaser or Construction Lender may be inadequate and that each party hereto shall be entitled to the remedy of specific performance, in addition to any other remedy each party may have."

### III.    Buyer's Unilateral Termination of the PSA

While Seller was constructing the three office buildings to Buyer's specifications, the 2008 fiscal crisis caused real estate prices to plummet. As the office buildings neared completion, Buyer negotiated to resell the property and improvements to a third party for $70 million, which exceeded the $68 million purchase price that Buyer had agreed to pay Seller. But in February 2009, the third party withdrew its letter of intent, claiming that a recent appraisal had shown the property and improvements to be worth only about $55 million.

In March 2009, Buyer notified Seller that it was terminating the PSA and requesting the return of its $13 million deposit. Buyer's termination letter cited section 11(g) of the PSA, which stated that Seller must "promptly notify Buyer in writing of . . . any event or circumstance of which Seller has actual knowledge subsequent to the date of this Agreement which (i) adversely affects the Property (or any portion thereof) or the use, operation or value of the Property (or any portion thereof) . . . . Buyer shall have the right within fifteen (15) business days after receipt of Seller's written notice pursuant to this Section 11(g) to elect to terminate this Agreement, whereupon the Deposit shall be returned to Buyer, and Buyer and Seller shall each be released from all liability hereunder." The termination letter claimed that Seller had violated section 11(g) by failing to inform Buyer of the "collapse of the credit markets, the dramatic drop in tenant

6

leasing, and the decline of real estate values generally as well as specifically with respect to this Property."

Seller viewed Buyer's termination letter as an anticipatory breach of the PSA. Seller denied that it had any obligation under section 11(g) of the PSA to inform Buyer of recent economic events or circumstances related to the 2008 fiscal crisis. In Seller's view, section 11(g) applied primarily to the discovery during construction of any physical conditions related to the property that affected its "use, operation or value." Seller contended that in light of Buyer's terminating breach, it was entitled to retain the deposit as liquidated damages under section 10(a) of the PSA.

This litigation commenced after Buyer and Seller made competing demands on the escrow holder to release the deposit. The escrow holder interpleaded the deposit with the superior court, which consolidated the respective complaints of Buyer, Seller, and Bank in a single action.

## IV.     Liquidated Damages Versus Specific Performance

Initially, both sides sought to recover the $13 million deposit. Seller's original pleading, which was drafted by the same law firm that had represented Seller in the negotiation of the PSA and TPA, did not seek specific performance. Seller's original complaint and Bank's original complaint in intervention sought to recover the deposit as liquidated damages for Buyer's terminating breach.[2] Buyer's original complaint sought to recover the deposit based on Seller's violation of section 11(g) of the PSA.

Both Seller and Bank relied upon the liquidated damages provision in section 10(a) of the PSA, which provided in relevant part: "BUYER AND SELLER THEREFORE AGREE THAT . . . IF BUYER FAILS TO COMPLETE THE PURCHASE OF THE PROPERTY ON THE CLOSING DATE AS HEREIN PROVIDED BY REASON OF BUYER'S BREACH OR DEFAULT . . . THE

---

[2]     In addition, Seller alleged a fraudulent conveyance cause of action that was abandoned at trial after the court pointed out that, because Buyer never had any assets, it could not have fraudulently transferred any assets.

7

AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES AND THAT SELLER SHALL BE ENTITLED TO SAID SUM AS LIQUIDATED DAMAGES, WHICH SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY, EITHER AT LAW OR IN EQUITY.  IN SUCH EVENT, THE ESCROW HOLDER SHALL, UPON WRITTEN NOTICE FROM SELLER AND BUYER, IMMEDIATELY DELIVER THE DEPOSIT TO SELLER."[3]

However, as the litigation progressed, Seller (which had obtained new counsel) and Bank requested specific performance of Buyer's purchase obligation under both the PSA and TPA.[4]  Seller and Bank contended that the exclusive remedy provision in section 10(a) of the PSA—"liquidated damages . . . shall be Seller's sole and exclusive remedy, either at law or in equity"—did not bar specific performance of Buyer's purchase obligation under section 22 of the TPA, which expressly authorized the remedy of specific performance for a breach of the TPA.

Buyer also modified its theory of recovery at trial.  Instead of claiming that it was entitled to recover the deposit because of Seller's violation of section 11(g) of the PSA,[5] Buyer argued at trial that it had a termination right under section 11(g) based solely on a decline in property value.  Alternatively, Buyer argued that even if it had no termination right under section 11(g), section 10(a) of the PSA allowed it to cancel the sale and incur no further liability other than the loss of the deposit as liquidated damages.[6]

---

[3]    Hereafter, we will omit the original capitalization of section 10(a) of the PSA.

[4]    Before trial, Seller filed an amended complaint that requested specific performance of the PSA.  At trial, Seller's complaint was further amended to seek specific performance of the TPA.

[5]    Buyer's president Vance Murdoch admitted at trial that there was "no basis to argue that the Seller breached the purchase and sale agreement."  He denied that Buyer was "ever looking to the Seller to provide . . . any information about market conditions."

[6]    Buyer's counsel testified without contradiction that during negotiations, she had insisted that liquidated damages would be the sole and exclusive remedy for a terminating breach by Buyer.

8

## V. The Statement of Decision and Judgment

In its 33-page statement of decision, the trial court rejected Buyer's contract arguments. The trial court found that: (1) because Seller had fully performed its obligations, the conditions to Buyer's purchase obligation had been met; (2) because section 11(g) of the PSA did not give Buyer a termination right based on a decline in property value, Buyer was liable for breach of contract; (3) because Buyer and Seller did not issue a joint instruction for the immediate release of the deposit to Seller, the "sole and exclusive remedy" provision in section 10(a) of the PSA, whatever it might mean, was inapplicable; and (4) Seller and Bank were entitled to specific performance of Buyer's purchase obligation under sections 2 and 22 of the TPA.

### A. The Trial Court Found That Buyer Committed a Terminating Breach

The trial court stated that "Buyer owed the Bank the obligation . . . to pay the purchase price, if the Seller performed the PSA, and to pay to the Bank directly, from that purchase price, an amount that would pay-off . . . the Bank's construction loan to the Seller. The court has determined that the Seller did perform the PSA, and that, therefore, defendant's termination of the PSA breached obligations that the Buyer owed the Bank under the TPA. Defendant's failure to pay the purchase price left the Bank (and the Seller) with ticking unpaid construction loans."

In rejecting Buyer's contention that section 11(g) of the PSA provided a termination right if the property value declined, the trial court pointed out the parties never discussed such a right. Because Buyer would have enjoyed "all the upside potential" while Seller would have carried "all the downside risk on a $68 million real estate sale," the court stated "the parties would have discussed that material term before they signed the contract. . . . That there was no such discussion establishes that the parties did not intend nor agree that the Buyer would have a right to terminate the PSA/TPA contract if the Property's 'value' declined."

9

The trial court also noted that Buyer's principal, Philip Hench, "reviewed the contract over several months, but did not discover in section 11(g) or any other section any right by the Buyer to terminate the contract, until that position was suggested to him in February, 2009 by his trial lawyers. That a real estate professional, like Philip Hench, the person who negotiated the PSA for the Buyer, a man who closes a half dozen major real estate transactions a year, and manages a one billion dollar real estate portfolio, when asked to examine the PSA contract for a right of termination, does not discover any basis to terminate speaks compellingly to two conclusions: that the Seller was not in breach of any obligation under the PSA; and that there is no reasonable interpretation of the PSA that allows the Buyer to quit the contract merely because the Property falls in market value.

"This testimony, unrefuted by [Buyer], supports the court's view that the parties to the contract did not discuss and, therefore, did not agree that the Buyer would have a right to terminate the contract, if the market value of the Property declined. The evidence is admissible to show that the contract terms do not, and were not understood by the parties to, include any right in defendant Buyer to not pay the purchase price if the plaintiff Seller performed its side of the bargain.

"Civil Code section 1649 provides: 'If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, the promisee understood it.' The court finds, based on the evidence, that the Buyer (and CBREI acting for the Buyer) interpreted the PSA contract in the same sense the Seller (and the Bank) understood it: that being, if the Seller performed the PSA contract, the Buyer was obligated to pay the purchase price. Hench, at his deposition, testified to reaching this understanding with Armstrong and Butcher at an early meeting. This excerpt from Hench's deposition was read at trial:

"QUESTION: In the initial discussions before the letter of intent?

"ANSWER: I don't recall. I would be speculating.

"QUESTION: You told them that you — that you, the entities that you represented, had done similar deals, yes or no?

10

"ANSWER:  Yes.

"QUESTION:  Okay.  Tell me what you told them.

"WITNESS:  I don't recall the specifics.

"QUESTION:  Okay.  What — Okay.  You said similar.  Similar to what?  What were the deal points that you were talking about at that — those meetings?

"ANSWER:  They build it, we buy it.

"QUESTION:  Okay.  In any of those meetings, did you tell them but if the value goes down between the time that you build it and we[']re to buy it, we're out of here or anything to that effect?  Did you tell them that?

"[ANSWER]:  No."  (Fn. omitted.)

The trial court further stated:  "Civil Code section 1638 provides this guidance:  'The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.'  The word 'value' when read in the context of the remainder of section 11(g) is, in the court's view, clear and sufficiently explicit to guide the parties in their performance under the PSA.  Defendant's argument that the word 'value' may be read independently of its context to give the Buyer an option to repudiate a $68 million purchase promise because market conditions changed is, in the court's view, an 'absurdity.'"

B.      *The Trial Court Granted Seller and Bank Specific Performance of Buyer's Purchase Obligation Under the TPA*

As to Buyer's alternative theory that section 10(a) of the PSA limited its liability for a terminating breach to the loss of the deposit as liquidated damages, the trial court found it "unnecessary to decide the issue."  After stating "the court chooses not to suggest a definitive meaning for" the phrase, "sole and exclusive remedy, either at law or in equity," the court explained that section 10(a) was inapplicable and that Seller and Bank were entitled to specific performance of Buyer's purchase obligation under the TPA.

The trial court found that although Seller might have been satisfied with liquidated damages during the early phases of construction, liquidated damages were insufficient

11

once construction was complete or nearly complete. According to the trial court, section 10(a) "provides an avenue to the Seller to obtain an early payment of liquidated damages, if the Buyer and Seller agree . . . . If the Buyer had given notice of its termination early during the construction phase, the fast payment of the liquidated damages, especially in the sizable amount of $13 million, may have satisfied the Seller. However, once the construction was complete, or nearly complete, only specific performance can provide the Seller's (and the Bank's) expectations under the PSA/TPA contract." (Fn. omitted.)

The trial court viewed section 10(a)'s liquidated damages provision as a self-executing process that Buyer had "frustrated" by informing "the escrow holder to not deliver the letter of credit [deposit] to the Seller." The court explained: "Section 10(a) provides that the Seller and Buyer must agree before the Seller can access the letter of credit that was posted as the liquidated damage fund. Section 10(a) reads (capitals omitted): 'In such event [Seller's entitlement to liquidated damages], the escrow holder shall, **upon written notice from the Seller and Buyer**, immediately deliver the deposit to the Seller [in cash or other immediately available funds if the deposit is a cash deposit] and in the event the deposit is a letter of credit deposit, escrow holder shall promptly draw upon such letter of credit and deliver the proceeds thereof to Seller' (bolding added). The Buyer, in this case, frustrated the automatic operation of that provision by advising the escrow holder to not deliver the letter of credit to the Seller."

The trial court found that because section 22 of the TPA authorized the remedy of specific performance, "[s]ection 10(a) cannot be read to delete or even qualify another independent contract section that expressly, conspicuously and unequivocally provides that a specific performance remedy is granted and preserved in every party to the contract." The trial court stated that because Bank was not a party to the PSA, "only the Seller and not the Bank is subject to the PSA section 10(a)."

The trial court found that under sections 2 and 22 of the TPA, Bank had an independent right to enforce Buyer's purchase obligation, which Bank could exercise without declaring Seller to be in default on the loan and without assuming Seller's rights under the PSA. The court found that under section 2 of the TPA, which established the

12

order in which the parties would perform their respective obligations at closing, Bank had an independent right to compel Buyer to pay off the loan: "The Bank also has direct rights against the Buyer that are not triggered by the Seller's default. Among these, the Bank has the right to compel the Buyer to pay off the construction loan if the Seller delivers the Property in conformity with the PSA."

Significantly, the trial court found that in section 2 of the TPA, Buyer had "committed" to pay off the loan: "The parties recognized, too, that the Bank would not make the construction loan unless the Buyer committed to paying off the loan when it took delivery of the Property. The TPA, for that reason, requires the Buyer to re-pay the construction loan directly to the Bank from the purchase price. TPA, section 2."

The court stated that by "signing the TPA, [Buyer] accepted the Seller's direction that the Buyer would pay off the construction loan directly to the Bank from the purchase price. The Bank, therefore, can enforce directly against the Buyer its obligation to pay from the purchase price an amount sufficient to pay off the construction loan. Consequently, [Buyer's] argument that the Bank has no rights that are specifically enforceable against the Buyer is erroneous as a matter of contract interpretation."

The trial court stated: "The Buyer's interpretation of the PSA/TPA reads out of the contract the TPA's sections 2 and 22. This is not allowed under Civil Code section 1641 (and other statutory provisions [requiring the whole of the contract to be taken together, to give effect to every part]). Section 10(a)'s 'sole and exclusive' language cannot delete or qualify a free-standing, unambiguous provision that allows to any party the right to seek a specific performance remedy to redress a contract breach. The Buyer also references, in its argument, particular language from [TPA] section 22 and TPA section 5(f)(ii[]), but those provisions do nothing more than reference the Buyer's rights as specified in the PSA, section 10(a). Those clauses do not subtract from the parties' rights under the TPA section 22 to a specific performance remedy. This is especially so as the Bank's right to specific performance is not affected by PSA section 10(a), nor to references elsewhere in the PSA/TPA contract to section 10(a)."

13

The trial court found that equitable considerations favored the granting of specific performance against Buyer: "The Bank agreed to make construction loans of $60 million because it viewed the Buyer's promise to take delivery, subject always to the Seller's build out according to the PSA, as a take-out commitment that would insure the repayment of the loan. The Bank officers otherwise feared that the Bank would have as security only 'completed building[s] that had no tenant improvements, no leasing commissions built into it and no tenants and no cash flow.' [¶] The court, having found that the Seller, but for the Buyer's breach, would have delivered the Property to the Buyer in conformity with the PSA, the Buyer became obligated to pay the purchase price and to pay therefrom such amount directly to the Bank as was required to pay off the Bank's construction loan. The Bank satisfies all conditions to obtaining specific performance . . . ." (Internal record reference omitted.)

The trial court explained that granting specific performance against Buyer would (1) preserve the specific performance remedy in section 22 of the TPA, which is a more specific and precise provision than section 10(a) of the PSA, (2) reach a "more internally consistent reading of the unified PSA/TPA contract (as only the Seller and not the Bank is subject to the PSA section 10(a)—how could the Bank get specific performance from the Buyer if it couldn't require the Seller to convey the Property to the Buyer, thus providing specific performance to the Seller as well?)," and (3) avoid rendering the specific performance remedy in section 22 of the TPA "nugatory, meaningless and without effect."

However, the trial court also recognized that it was breaking new ground by granting specific performance to Bank, which did not own the property: "There is no decision immediately on point, so far as the court's research has discovered, wherein a first trust deed lender has obtained specific performance of a real estate sale contract. The parties' contract, in this case, gives the Bank that right, however, and, as the Bank has proved its borrower's (the plaintiff's) performance of the sale contract, no legal precedent denies specific performance to a party whose security interest in real property is to be paid from the promised purchase price. The court shall treat the Bank's position

14

as analogous to a willing vendor, though without the requirement that the Bank must deliver actual legal title (which it does not have) to complete the transfer, provided that the actual vendor delivers title as required for specific performance. The court, treating the Bank analogously to a vendor, shall award the incidental compensation to cover the Bank's additional expenses due to the Buyer's breach of its obligation to pay off the vendor's construction loan directly to the Bank."

## DISCUSSION

Buyer's appeal raises two main contract issues: (1) whether its termination of the sale was authorized by section 11(g) of the PSA; and (2) whether section 10(a) of the PSA—which specified that liquidated damages in the amount of the deposit would be the sole and exclusive remedy, either at law or in equity, for a terminating breach by Buyer— precluded the $79 million award that was granted in this case.

"'""The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. [Citations.] When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. [Citation.] 'The words of a contract are to be understood in their ordinary and popular sense.' [Citations.]" [Citation.]' (*Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1198, fn. 3.)" (*Barroso v. Ocwen Loan Servicing, LLC* (2012) 208 Cal.App.4th 1001, 1009.) "'""It is . . . solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.' [Citations.]" [Citation.]' (*Davies v. Sallie Mae, Inc.* (2008) 168 Cal.App.4th 1086, 1091.)" (*Barroso v. Ocwen Loan Servicing, LLC*, *supra*, at pp. 1008-1009.)

"'""A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643; *Beverly Hills Oil Co. v. Beverly Hills Unified Sch. Dist.* (1968) 264 Cal.App.2d 603, 609.) "The court must avoid

an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable." (*Strong v. Theis* (1986) 187 Cal.App.3d 913, 920.)' (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111-1112.)" (*Barroso v. Ocwen Loan Servicing, LLC*, *supra*, 208 Cal.App.4th at pp. 1012-1013.)

**I.      Section 11(g) of the PSA Did Not Allow Buyer to Terminate the PSA If the Property Declined in Market Value**

Buyer contends that its termination of the PSA was authorized by section 11(g) of the PSA. We disagree. We conclude the plain language of the agreement fails to support Buyer's contention.

Section 11(g), by its terms, is a notice provision that required Seller to "promptly notify Buyer in writing of any change in any aspect of the physical condition of the Property (or any portion thereof) or of any event or circumstance of which Seller has actual knowledge subsequent to the date of this Agreement which (i) adversely affects the Property (or any portion thereof) or the use, operation or value of the Property (or any portion thereof), or (ii) makes any representation or warranty of Seller to Buyer under this Agreement untrue or misleading in any material respect . . . . Buyer shall have the right within fifteen (15) business days after receipt of Seller's written notice pursuant to this Section 11(g) to elect to terminate this Agreement, whereupon the Deposit shall be returned to Buyer, and Buyer and Seller shall each be released from all liability hereunder . . . ."

In light of the two-year construction project that Seller had undertaken in the PSA, it is reasonable to conclude that section 11(g) of the PSA required disclosure of new circumstances or facts discovered during construction that would adversely affect Buyer's use of the property. We believe Seller was obligated to disclose any changes to the property, such as new local parking regulations or municipal restrictions, that would adversely affect the property or the "use, operation or value of the Property (or any portion thereof)."

16

Expanding section 11(g)'s notice requirement to encompass general economic conditions is unreasonable, given that it is undisputed that Buyer's principals are experienced real estate investors and managers who neither wanted nor needed any assistance in that regard. According to Buyer's principal, Vance Murdoch, Buyer was never "looking to the Seller to provide . . . any information about market conditions."

There is nothing in the language of section 11(g) that remotely suggests Buyer was entitled to terminate the PSA and recover the deposit based solely on a decline in property value. Even Buyer's principal, Philip Hench, was unable to find such a right after studying the PSA for several weeks, if not months. The purported right was not mentioned in Buyer's original complaint or discussed by the parties during negotiations. We therefore conclude that Buyer failed to establish the existence of a termination right based on a decline in property value.

## II. Section 10(a) Limited Buyer's Liability for a Terminating Breach to Liquidated Damages in the Amount of the Deposit

Buyer contends the trial court erred in failing to enforce section 10(a)'s clear and unambiguous limitation on its liability for a terminating breach.[7] We conclude Buyer is correct. We find that under section 10(a) of the PSA, Buyer's liability for a terminating breach was limited to liquidated damages in the amount of the deposit.

### A. *Seller Could Not Reject Liquidated Damages to Seek Other Remedies*

Seller contends that section 10(a) provided it the option of accepting liquidated damages, in which case they would constitute its sole and exclusive remedy or, as it did

---

[7] Section 10(a) stated in relevant part, "Buyer and Seller therefore agree that . . . if Buyer fails to complete the purchase of the property on the closing date as herein provided by reason of Buyer's breach or default . . . the amount of the deposit is a reasonable estimate of Seller's damages and that Seller shall be entitled to said sum as liquidated damages, which shall be Seller's sole and exclusive remedy, either at law or in equity. In such event, the escrow holder shall, upon written notice from Seller and Buyer, immediately deliver the deposit to Seller."

here, rejecting the damages and pursuing the remedy of specific performance. Seller asserts this is so because Buyer's breach entitled it to liquidated damages and an entitlement may be declined. In further support of its claim, Seller cites language in the section that states "[s]uch retention of the deposit by Seller is intended to constitute liquidated damages." However, the remainder of the sentence states that retention of the damages is "intended to constitute liquidated damages to Seller pursuant to sections 1671, 1676 and 1677 of the California Civil Code and shall not be deemed to constitute a forfeiture or penalty within the meaning of section 3275 or section 3369 of the California Civil Code, or any similar provision." Nothing in that clause suggests Seller was free to choose its remedy in the event of a breach by Buyer. Seller's interpretation of section 10(a) eviscerates its clear statement that liquidated damages "shall be Seller's sole and exclusive remedy, either at law or in equity" and is not supported by any of the terms of that section.

### B.  Civil Code Sections 1680 and 3389

Seller and Bank argue that in order to preclude the right to specific performance, a contract must include an express waiver of Civil Code sections 1680 and 3389.[8] We conclude, however, that a waiver of sections 1680 and 3389 would be redundant where, as here, the contract limits the Buyer's liability for a terminating breach to the loss of the deposit as liquidated damages.

Neither section 1680 nor section 3389 injects a specific performance remedy into a contract that is not subject to specific performance. The two statutes provide that if a contract is subject to specific performance, it may be specifically enforced, even though a penalty is imposed or damages are liquidated for its breach. Section 1680 states: "Nothing in this chapter affects any right a party to a contract for the purchase and sale of real property may have to obtain specific performance." Section 3389 states: "A contract otherwise proper to be specifically enforced, may be thus enforced, though a

---

[8]     All further statutory references are to the Civil Code.

penalty is imposed, or the damages are liquidated for its breach, and the party in default is willing to pay the same."

In determining whether Buyer's obligation to purchase the property is subject to specific performance, we are guided by the following principles. In general, if a contract states that upon the purchaser's cancelation of the sale, the deposit shall be forfeited *and* the purchaser shall be relieved of any further liability, the purchaser's obligation to complete the sale is not subject to specific performance. (*People v. Ocean Shore R. R. Co.* (1949) 90 Cal.App.2d 464, 469-470, disapproved on another ground in *County of San Diego v. Miller* (1975) 13 Cal.3d 684, 689.) But where a contract merely states that the purchaser's deposit shall be forfeited, and there is no indication that the purchaser shall be relieved of any further liability, the purchaser's obligation to complete the sale is subject to specific performance. (*People v. Ocean Shore R. R. Co.*, *supra*, at pp. 469-470.)

As previously noted, section 10(a) of the PSA provides that if the sale is not completed because of a default or breach by Buyer, Seller's sole and exclusive remedy, either at law or in equity, is liquidated damages in the amount of the deposit. We read section 10(a) to mean that, in the event of a terminating breach by Buyer, (1) Buyer shall forfeit the deposit, *and* (2) Buyer shall incur no further liability for the breach, either at law or in equity. We therefore conclude that Buyer's purchase obligation under the PSA is not subject to specific performance and, therefore, the absence of a waiver of sections 1680 and 3389 was irrelevant. (See *People v. Ocean Shore R. R. Co.*, *supra*, 90 Cal.App.2d at pp. 469-470.)


C.     *Buyer Did Not Forfeit Section 10(a)'s Limitation on Liability*

Section 10(a) of the PSA provides that when the right to liquidated damages is established, "the escrow holder shall, upon written notice from Seller and Buyer, immediately deliver the deposit to Seller." Based on this language, the trial court inferred that any limitation on Buyer's liability under section 10(a) was contingent upon a joint instruction for the immediate release of the deposit to Seller. The trial court ruled that

19

because no joint instruction had been given in this case, Buyer had forfeited whatever limitation on liability might have existed under section 10(a).

We conclude that the trial court erred by reading into section 10(a) a contingency that was not specified in the agreement. If the limitation on liability was contingent on a joint instruction for the immediate release of the deposit, the parties and their attorneys would have discussed the contingency during negotiations and, upon Buyer's failure to issue a joint instruction, Seller's original complaint would have requested specific performance of the purchase obligation. The fact that Seller's original complaint sought liquidated damages as the sole remedy strongly indicates that Seller understood the limitation on Buyer's liability was not contingent on a joint instruction for the release of the deposit. We therefore decline to read into section 10(a) a contingency that is not supported by the language of the contract or the evidence. Accordingly, we reject the trial court's finding that Buyer forfeited section 10(a)'s limitation on liability.

> D.      *Sections 2 and 22 of the TPA Did Not Create an Independent Purchase Obligation that Bank Could Enforce Against Buyer*

Buyer contends that section 2[9] of the TPA did not create an independent purchase obligation that Bank could enforce against Buyer under section 22[10] of the TPA. We conclude Buyer is correct.

---

[9]      Section 2 of the TPA stated: "Sale and Purchase. Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and pay the purchase price set forth in the Purchase Agreement (the 'Purchase Price') for the Property, subject to and in accordance with the terms, provisions and conditions contained in the Purchase Agreement, as the same may be modified hereby; and Seller hereby authorizes and directs Purchaser to pay to Construction Lender in connection with the Closing (hereinafter defined) such portion of the Purchase Price as is necessary to satisfy the Construction Loan in full (a) upon delivery by Construction Lender of a full reconveyance of the Property from the lien of the deed of trust that secures the obligations of Seller under the Construction Loan and terminations of all financing statements filed in connection therewith, in form and substance reasonably satisfactory to Seller, Purchaser and Title Company; and (b) upon satisfaction of all conditions to Purchaser's payment thereof set forth in the Purchase Agreement. In the event the Purchase Price is insufficient to pay in full the Construction

20

Although the TPA discussed the parties' respective obligations at closing—in section 2 of the TPA, the parties agreed that in connection with the closing, upon Bank's reconveyance of the deed of trust and Seller's satisfaction of all conditions to Buyer's purchase obligation, Buyer was to pay Bank the portion of the purchase price necessary to pay off the loan—the TPA did not discuss the parties' obligations in the event the sale was canceled because of a default or breach by Buyer. That subject was addressed in section 10(a) of the PSA, which specified that Buyer's liability for a terminating breach was limited to the loss of the deposit as liquidated damages.

The trial court found that section 10(a) of the PSA was trumped by section 22 of the TPA, which provided for specific performance in the event of a breach of the TPA. The trial court found that because section 2 of the TPA created an independent purchase

Loan, Seller shall at the Closing pay to Construction Lender such additional amount necessary to achieve full payment of the Construction Loan. Notwithstanding anything contained in this Agreement, or any other document or agreement which may be construed to the contrary, in no event shall Construction Lender be obligated to release its deed of trust encumbering the Property unless and until all indebtedness and obligations secured thereby have been paid in full; provided, however, that Construction Lender shall cause the 3-Story Buildings to be reconveyed from the lien of the deed of trust and any other Construction Loan Documents and terminate all financing statements related thereto upon the request of Seller, concurrently with the sale of the 3-Story Buildings under the Purchase Agreement and the satisfaction of the following conditions: (i) payment of a release price to Construction Lender in the amount determined by multiplying the Final Rentable Square Footage attributable to the 3-Story Buildings by $242, (ii) Construction Lender's receipt, at Seller's expense, of a 111 endorsement to Construction Lender's lender's policy of title insurance, (iii) the 3-Story Buildings and the 6-Story Building shall constitute separate legal lots in accordance with California law, and (iv) no Event of Default (after the expiration of any applicable notice and/or cure period) shall exist under the Construction Loan Documents. Seller and Purchaser each agree to pay at the Closing all closing costs required under the Purchase Agreement to be paid by each of them as provided therein and Seller agrees to pay the cost of such 111 endorsement."

**10** Section 22 of the TPA stated: "Remedies. Each of the parties hereto recognizes and agrees that remedies at law for breach of this Agreement by Seller, Purchaser or Construction Lender may be inadequate and that each party hereto shall be entitled to the remedy of specific performance, in addition to any other remedy each party may have."

21

obligation that was breached by Buyer, Bank could specifically enforce that obligation under section 22 of the TPA.

However, we reach the opposite conclusion. We find that section 22 of the TPA did not override PSA section 10(a)'s limitation on Buyer's liability. We also find that section 2 of the TPA did not create an independent purchase obligation that could be specifically enforced under section 22 of the TPA.

1.    <u>Section 22 of the TPA Did Not Override Section 10(a) of the PSA</u>

Because Bank's rights under the PSA were acquired by assignment from Seller, Bank had no greater right than Seller to force an unwilling Buyer to complete the sale. Bank could not exercise its right to damages under the PSA until it assumed Seller's rights, which it never did. And if Bank were to assume Seller's rights under the PSA, Bank would be bound by the same PSA section 10(a) limitations as Seller. Bank agreed to this in section 5(a) of the TPA, which stated: "If Construction Lender shall have Elected to Complete, Construction Lender shall be deemed to have assumed the obligations of Seller under the Purchase Agreement, and hereby agrees to retain a construction manager reasonably acceptable to Purchaser, and Construction Lender shall be subject to the terms of the Purchase Agreement, including, without limitation, Section 10(a) thereof."

Bank also agreed that the TPA did not modify the PSA section 10(a) limitations. This was set forth in section 5(f)(ii) of the TPA, which stated: "Nothing contained in this Agreement shall limit or affect . . . the liquidated damages payable to Seller to the extent provided in Section 10(a) of the Purchase Agreement."

2.    <u>Section 2 of the TPA Did Not Create an Independent Purchase</u>
                <u>Obligation</u>

In granting Bank specific performance of Buyer's performance obligation, the trial court reasoned that in section 2 of the TPA, Buyer made a separate commitment to Bank to repay the construction loan. The trial court stated: "Bank agreed to make construction

22

loans of $60 million because it viewed the Buyer's promise to take delivery, subject always to the Seller's build out according to the PSA, as a take-out commitment that would insure the repayment of the loan. The Bank officers otherwise feared that the Bank would have as security only 'completed building[s] that had no tenant improvements, no leasing commissions built into it and no tenants and no cash flow.'" "The Buyer and the Seller understood that the Bank would not have provided a construction loan, and the project would not have been built, unless they signed an agreement that gave the Bank what it wanted in the TPA. . . . No party claims their lawyers did not know that the TPA, in section 22, gave all parties including the Bank the right to seek specific performance if there was a contract breach. The Bank's only effective remedy against the defaulting Buyer is specific performance."

However, we do not find in section 2 of the TPA a separate commitment by Buyer to repay the construction loan. We find, on the contrary, that section 2 merely incorporated Buyer's purchase obligation under the PSA. We find compelling support for our conclusion in section 9 of the TPA.

Section 9 of the TPA, which the trial court did not mention, provided that if the net worth of Buyer's parents or affiliates fell below the purchase price, Seller would be in default under the construction loan documents, but Buyer would not be liable, and Bank and Seller would have no rights against Buyer, for Seller's default.[11] We read section 9 to mean that if, for example, the closing did not occur because Buyer's parents or affiliates lacked the necessary funds to purchase the property, Seller would be in default

---

[11]    Section 9 of the TPA stated: "Reporting. Promptly after Construction Lender's written request, given not more frequently than one in each calendar quarter, Purchaser shall deliver to Construction Lender copies of Purchaser's and its parents' and affiliates' most recent consolidated financial statements. As used herein, 'Purchaser's Net Worth' means Purchaser's parents' and affiliates' consolidated capital plus such parties' unfunded capital commitments as shown on such parties' financial statements. In the event that Purchaser's Net Worth at any time while the amounts under the Construction Loan are outstanding is less than the Purchase Price, an Event of Default shall exist under the Construction Loan Documents with respect to Seller, but Purchaser shall have no liability, nor shall Construction Lender or Seller have any rights against Purchaser, for the same."

23

under the construction loan documents, but Bank would have no right to force Buyer to pay off the loan.

By reading an enforceable purchase obligation into section 2 of the TPA, the trial court effectively nullified the express immunity provided to Buyer's parents and affiliates by section 9 of the TPA—that if Buyer should default, Buyer's parents and affiliates were protected from liability for Seller's default on the construction loan. The trial court's interpretation violates section 1641, which provides: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

"'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) 'A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) 'The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed.' (Civ. Code, § 1644.)" (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 458.)

Applying the above standards to this case, the PSA and TPA must be construed in light of the conditions that existed *before* the financial and real estate markets plummeted in the 2008 economic crisis. At the time, a provision for liquidated damages as the sole and exclusive remedy at law or in equity made sense to the parties and that is the agreement they made.

Based on our review of the PSA and TPA, we conclude that: (1) under section 10(a) of the PSA, Buyer's liability for a terminating breach was limited to liquidated damages in the amount of the deposit; (2) under section 22 of the TPA and sections 5(a) and 5(f)(ii) of the TPA, the PSA section 10(a) limitations on Buyer's liability were not

24

altered by the TPA; and (3) section 2 of the TPA did not create an independent purchase obligation that Bank could enforce against Buyer under section 22 of the TPA.

### III. Conclusion

In light of our interpretation of the agreements, we affirm the finding of Buyer's liability for a terminating breach, but reverse the awards of specific performance, incidental compensation, and damages in excess of the deposit.[12] We direct the trial court on remand to modify the judgment, which shall provide for liquidated damages in the amount of the deposit as Seller and Bank's sole and exclusive remedy.

Seller's attorney fee award must fall with the reversal of damages in excess of the deposit. Because Seller will no longer prevail on all of its claims, its right to attorney fees under the contract, if any, must be reestablished on remand. (See *Jackson v. Homeowners Assn. Monte Vista Estates-East* (2001) 93 Cal.App.4th 773, 789 [if there is no simple, unqualified victory on all contract claims, the trial court has discretion to determine which party prevailed on the contract or, whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees].) In light of the reversal of the fee award, Buyer's appeal from Seller's attorney fee award is dismissed as moot.

The alter ego motion against Fund V was based on the unpaid damages in excess of the deposit. Given the reversal of the unpaid damages and attorney fee award, it is unclear whether any need for alter ego liability still exists. In light of this uncertainty, we reverse the alter ego order without prejudice to Seller and Bank's right to file a new motion if the need arises on remand. Fund V's appeal from the alter ego order is dismissed as moot.

---

**12**     Buyer alternatively contends the trial court erred in refusing to allow an amendment to seek rescission of the PSA based on its mistaken belief that section 10(a) contained a valid limitation of liability. In light of our determination that Buyer's liability was limited to the loss of the deposit, we need not address this issue.

**DISPOSITION**

In appeal B226933, the judgment is affirmed as to defendant SPUS05 Corona Summit, LLC's liability for breach of contract in the amount of the deposit, but is reversed as to the awards of specific performance, incidental compensation, and compensatory damages in excess of the deposit. Seller's award of attorney fees is reversed without prejudice. The order imposing alter ego liability against CB Richard Ellis Strategic Partners U.S. Opportunity 5 LP is reversed without prejudice.

The consolidated appeals B231109, B232645, B234103, and B235534 are dismissed as moot.

The matter is remanded for further proceedings consistent with the views set forth in this opinion. Each party is to bear its own costs in each appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.